# EXHIBIT 1

**LINKS: 65, 66**

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| LOS FELIZ FORD, INC. dba STAR CHRYSLER JEEP, | **Case No. CV 10-6077 GAF (MANx)** |
| Plaintiff, | MEMORANDUM AND ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT |
| v. | |
| CHRYSLER GROUP, LLC | |
| Defendant. | |

## I.

## INTRODUCTION

In 2007, Chrysler, LLC ("Old Chrysler") was in the midst of an effort to restructure its operations. Although some progress had been made in those efforts by the middle of 2008, the global credit crisis created massive liquidity problems for the company, which sustained a $16.8 billion operating loss in 2008. Old Chrysler sought assistance from the federal government and eventually filed for bankruptcy. Through negotiations with potential partners, the business's creditors, the Obama administration's Auto Task Force, and other interested parties, the business was restructured under Chapter 11. As part of the Chapter 11 reorganization, a new

company, Chrysler Group, LLC ("New Chrysler") acquired many of Old Chrysler's assets, including the assumption of 2,400 of Old Chrysler's dealer sales and services agreements. Sales and services contracts with 789 other dealers were terminated. The bankruptcy court approved the termination in a June 2009 written order, finding that Old Chrysler had established sufficient business reasons to overcome the objections of the terminated dealers.

The dealers then took their case to Congress, where they found a sympathetic ear. In December 2009, Congress included in the Consolidated Appropriations Act of 2010 ("the Act") a provision, Section 747, that established an arbitration remedy for dealers seeking "continuation, or reinstatement of a franchise agreement, or to be added as a franchisee to the dealer network" of the reorganized automobile manufacturers, including New Chrysler. Dealers who petitioned for arbitration and met the standards established in Section 747(b) were entitled to an order directing New Chrysler to provide the dealer with a "customary and usual letter of intent to enter into a sale and service agreement."

Plaintiff, Los Feliz Ford, Inc., dba Star Chrysler Jeep ("Star") is one of these dealers. Star pursued its rights under Section 747 through arbitration, and obtained a favorable result. The arbitrator's award directed New Chrysler to provide Star with a "customary and usual letter of intent to enter into a sales and service agreement," as required by Section 747. New Chrysler responded by delivering to Star a Letter of Intent ("the Letter") that it contends contains the usual and customary terms and conditions included in the vast majority of the letters of intent issued to potential New Chrysler dealers. Star disagreed, claiming that the Letter it received was not "customary and usual" within the meaning of Section 747, and that the offer contained several clauses that were so oppressive and unreasonable as to render the proposal illusory. Star then filed this lawsuit, contending that it is entitled essentially to reinstatement as a dealer under the terms and conditions under which it was operating

prior to Old Chrysler's bankruptcy, and to money damages under both Section 747 and California law.

The parties now cross-move for summary judgment, contending that the undisputed facts support their respective positions. The Court agrees that the case is ripe for summary adjudication. For reasons discussed in greater detail below, the Court concludes that:

(1) Section 747 should be construed to mean that terminated dealers may be added to New Chrysler's dealer network if the dealer succeeds in arbitration;

(2) The only remedy available under Section 747 is the issuance of a customary and usual letter of intent to enter into a sales and service agreement;

(3) The undisputed facts establish that the Letter issued to Star complied with the requirements of Section 747 because the terms and conditions included in the Letter, particularly after New Chrysler modified Paragraph 5 of the Letter, are found in the vast majority of letters of intent, including those issued by Old Chrysler between 2006 and the 2009 bankruptcy; and

(4) Star is not entitled to recover money damages under either Section 747 or any of its state law causes of action. Because Star would have no rights of any sort after its sales and service agreement was extinguished in bankruptcy, Section 747 provides it with its sole remedy.

New Chrysler's motion for summary judgment is **GRANTED**; Star's motion for summary judgment is **DENIED.**

## II.

## BACKGROUND

From 1985 to 2009, Star was a profitable Chrysler Jeep Dealer in Glendale, California.  (Docket No. 78, Chrysler Group's Response to Star's Statement of Undisputed Material Facts ("C-SUF") ¶ 3.)  When plummeting auto sales and the global credit crisis forced Chrysler's predecessor ("Old Chrysler") into Chapter 11 bankruptcy, the company agreed to sell substantially all of its assets to a group organized by Fiat.  Under the terms of the sale agreement, Fiat assumed the sales and service contracts of 2,400 of Old Chrysler's 3,189 dealers; the contracts with the 789 dealers were terminated in proceedings in bankruptcy court.  In re Chrysler LLC, No. 09-50002-AJG, Docket No. 4145 (Bnkr. S.D.N.Y. Jun. 19, 2009) (Docket No. 65-3, Declaration of Phillip R. Cosgrove ("1st Cosgrove Decl."), Ex. B [Opinion Regarding Authorization of Rejection] at 17 n. 20.)  The bankruptcy court overruled various parties' objections and approved the sale on June 1, 2009, finding that Old Chrysler had established good business reasons for the sale of its assets, and that the Chrysler Group would purchase the assets free and clear of any third-party claims, including any claims by Old Chrysler dealers arising out of the rejection of their dealership agreements.  In re Chrysler, No. 09-50003, Docket No. 3232 (AJG) (Bnkr. S.D.N.Y. Jun. 1, 2009) (1st Cosgrove Decl., Ex. C [Sale Order] at 17–20.)  Accordingly, the 789 dealer agreements were terminated with the final approval of the sale agreement.  (Docket No. 44, First Am. Compl. ("FAC") ¶ 10.)  Star was one of the 789 terminated dealers.  (Id.)

On December 16, 2009, in response to pressure from these dealers, Congress attached Section 747 to the Consolidated Appropriations Act of 2010 (the "Act'), which provided that:

> A covered dealership that was not lawfully terminated under applicable State law on or before April 29, 2009, shall have the right to seek, through binding arbitration, continuation, or reinstatement of a franchise agreement, or to be added as a franchisee to the dealer network of the covered manufacturer in the geographical area where the covered dealership was located when its franchise agreement was terminated, not assigned, not renewed, or not continued.

1  PL 111-117, 2009 HR 3288 § 747(b); (C-SUF ¶¶ 1–3.)  Pursuant to that provision, Star

2  elected to arbitrate the termination of its Chrysler and Jeep franchise agreements before

3  the American Arbitration Association ("AAA").  (Id. ¶ 4.)  Following proceedings

4  administered pursuant to AAA's Commercial Arbitration Rules, an arbitrator (the

5  "Arbitrator") issued a written determination in favor of Star, stating that the dealership

6  "shall be added to New Chrysler's dealer network with respect to the Chrysler/Jeep

7  dealership it was operating in Glendale, California at the time of rejection in June

8  2009."  (Id. ¶¶ 5–6.)

9        Pursuant to Section 747(d) of the Act, the Arbitrator examined a number of

10  factors in making his determination, including Star's historical profitability, Chrysler's

11  overall business plan, Star's economic viability, and the economic interests of the

12  parties' and the local and general public.  (Docket No. 66-5, Declaration of Michael M.

13  Sieving ("Sieving Decl."), Ex. 2 [Written Determination of Arbitrator] at 5.)  The

14  Arbitrator also addressed a December 16, 2009 agreement between New Chrysler and

15  Jack Ellis Dodge in Glendale, California, which gave to that entity Chrysler and Jeep

16  lines.  (C-SUF ¶ 35.)  The Arbitrator found that "it reasonably could have been

17  anticipated that [Star] might seek to have its dealership agreements reinstated," and that

18  "New Chrysler did not explain why it waited six months post-rejection before adding

19  the Chrysler and Jeep Lines to Jack Ellis Dodge, nor . . . why it did not wait another

20  month after Section 747 was enacted to see if [Star] would file a demand for

21  arbitration."  (Written Determination of Arbitrator at 11.)  The Arbitrator further found

22  that, "[i]n any event, . . . it does not appear that reinstating [Star] would cause confusion

23  in the Glendale market area," as "the evidence presented shows that Jack Ellis Dodge is

24  not achieving anywhere near the sales of Chrysler and Jeep products that [Star] was

25  doing even at its lowest point . . . ."  (Id.)

26        The parties do not dispute that, pursuant to Section 747 of the Act, Chrysler was

27  thereafter obligated to provide Star a "customary and usual letter of intent to enter into a

28  sales and service agreement . . . ."  PL 111-117, 2009 HR 3288 § 747(b); (C-SUF ¶ 9.)

5

Nor do the parties dispute that Chrysler subsequently issued Star a Letter of Intent, which specified certain conditions it would have to meet in order to enter into such an agreement.  (Id. ¶¶ 10–16.)  Rather, the parties dispute whether that Letter was "customary and usual" within the meaning of Section 747, and whether the Act contemplates additional remedies in the event that the parties cannot agree to the terms contained in such a letter.

The Letter issued by New Chrysler contains a number of provisions which Star contends are neither "customary and usual" within the meaning of Section 747 nor legal under the California Vehicle Code.  In particular, the Letter begins by conditioning the agreement on Star's establishment of a new facility:

> In accordance with the ruling of an arbitrator in a hearing held pursuant to Section 747 . . . Chrysler Group LLC ("CG") is issuing this Letter of Intent ("LOI") to enter into Chrysler and Jeep Sales and Service Agreements ("Agreement") in their then-customary form, with Los Feliz Ford Inc. ("You" and "Your") in the P129-San Fernando sales locality, as defined by CG, if You provide a new facility ("Facility") for the exclusive display, sales and service of the Chrysler and Jeep vehicle lines . . . ."

(Docket No. 77-7, Declaration of Phillip R. Cosgrove ("2d. Cosgrove Decl."), Ex. Q [Letter of Intent] at 1) (emphasis added).

Star also objects to the inclusion of a range of other provisions, which it contends render the Letter meaningless, frustrating the intention of Section 747.  Paragraph 5 of the Letter initially vested Chrysler with the "sole discretion" to terminate the Letter "[s]hould anyone file a protest or lawsuit, demand arbitration or otherwise challenge . . . the proposed establishment . . . ."[1]  (Id. ¶ 5.)  Paragraph 8 of the Letter requires that, "[b]efore [Chrysler] enters into a[n] Agreement with [Star], and before the Expiration Date," Star must "[c]omplete construction or renovation in accordance with the plans and specifications and obtain a certificate of occupancy for the Facility . . . ."  (Id. ¶

---

[1] On August 13, 2010, New Chrysler amended the Letter, removing from Paragraph 5 the provision allowing it to terminate the Letter if another dealer filed a legal challenge to Star's establishment. (C-SUF ¶ 13; 2d. Cosgrove Decl., Ex. P, Ex. 1 [August 13, 2010 Letter].)  As amended, Paragraph 5 suspends Star's deadlines under the Letter until any such legal challenge has been resolved, and allows New Chrysler to terminate the Letter only if such a legal challenge is successful.  (Id.)

8(A).)  Paragraph 8 further requires Star to "[e]xecute a document acknowledging [its] voluntary agreement not to protest as specified in Paragraph 13", which precludes Star from "protest[ing] or challeng[ing] the establishment and/or relocation of the Chrysler and Jeep vehicle lines for a period beginning on the effective date of [the Letter] and ending five (5) years from the effective date of [the] Agreement."  (Id. ¶ 13.)  Paragraph 13 also requires the dealer to "acknowledge[] that it is relinquishing a known, not prospective, right and that this right is knowingly and voluntarily relinquished in exchange for valuable consideration", and that such an agreement "is intended to benefit, create rights for and confer benefits upon [Chrysler] and any other third party relying upon th[e] voluntary agreement not to protest."  (Id.)  Finally, Paragraph 19 of the Letter states that "Michigan law will be used to interpret [the Letter], without regard to Michigan's conflicts of law rules," and that "[a]ny legal action based on [the Letter] must be filed in Oakland County, Michigan."  (Id. ¶ 19.)

Star contends that the inclusion of these qualifying and purportedly oppressive provisions frustrate Congress' intent in passing Section 747, as they are neither "customary and usual," nor do they allow fulfillment of the Act's remedial provisions. Chrysler contends that the Letter was "customary and usual" within the meaning of that Act, and that under the relevant case law such a letter "is the only remedy available under Section 747 to dealers, like Star, that prevailed in Arbitration."  (C-SUF ¶ 44.) Naturally, the parties offer competing interpretations of Section 747's text and legislative history, as well as conflicting evidence as to whether or not the Letter is "customary and usual" within the meaning of Section 747.

On the basis of these facts, Star asserts eight causes of action: [1] a judgment confirming the arbitration award; [2] violation of Section 747; [3] declaratory relief; [4] tortious interference with business expectancy; [5] breach of the covenant of good faith and fair dealing and of implied contract; [6] injunctive relief; [7] statutory violations of the California Vehicle Code; and [8] violations of California's unfair competition law ("UCL").  (FAC ¶¶ 30–97.)

7

The parties now cross-file for summary judgment. Resolution of Star's claims turn on two central issues, namely [1] the proper way to construe Section 747's remedial language; and [2] the proper way to construe Section 747's "customary and usual" language, and to apply it to the facts at hand. The Court addresses these issues in turn, and then turns to Star's various other state law claims.

## III.

## DISCUSSION

### A. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus, when addressing a motion for summary judgment, the Court must decide whether there exists "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial, which it can meet by presenting evidence establishing the absence of a genuine issue or by "pointing out to the district court . . . that there is an absence of evidence" supporting a fact for which the nonmoving party bears the burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). To defeat summary judgment, the non-moving party must put forth "affirmative evidence" that shows "that there is a genuine issue for trial." Anderson, 477 U.S. at 256–57. This evidence must be admissible. See Fed. R. Civ. P. 56(c), (e). The non-moving party cannot prevail by "simply show[ing] that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, the non-moving party must show that evidence in the record could lead a rational trier of fact to find for it. Id. at 587. In reviewing the record, the Court must believe the non-moving party's evidence, and must draw all justifiable inferences in its favor. Anderson, 477 U.S. at 255.

**B. REMEDIES AVAILABLE UNDER SECTION 747**

As Star contends that its rights arise out of Section 747, the Court must first address that statute's remedial scheme. Star contends that "the legislative history and the statute itself clearly express the intention that prevailing dealers be provided [1] a customary and usual [letter of intent], and [2] a sales and service agreement, based upon the [letter of intent], to execute shortly thereafter." (Docket No. 66, S-Mem. at 14.) Chrysler relies on a narrower reading of the statute and legislative history, as well as on federal case law supporting its position.

As noted above, Section 747(b) of the Act declares that:

> A covered dealership that was not lawfully terminated under applicable State law on or before April 29, 2009, <u>shall have the right to seek, through binding arbitration, continuation, or reinstatement of a franchise agreement, or to be added as a franchisee to the dealer network of the covered manufacturer</u> in the geographical area where the covered dealership was located when its franchise agreement was terminated, not assigned, not renewed, or not continued.

PL 111-117, 2009 HR 3288 § 747(b) (emphasis added). Section 747(e) further provides that:

> If the arbitrator finds in favor of a covered dealership, <u>the covered manufacturer shall as soon as practicable, but not later than 7 business days after receipt of the arbitrator's determination, provide the dealer a customary and usual letter of intent to enter into a sales and service agreement.</u> After executing the sales and service agreement and successfully completing the operational prerequisites set forth therein, a covered dealership shall return to the covered manufacturer any financial compensation provided by the covered manufacturer in consideration of the covered manufacturer's initial determination to terminate, not renew, not assign or not assume the covered dealership's applicable franchise agreement.

<u>Id.</u> § 747(e) (emphasis added).

The statute thus delineates three potential remedies, namely "continuation, or reinstatement of a franchise agreement, or to be added as a franchise to the dealer network of the covered manufacturer . . . ." <u>Id.</u> § 747(b). Further, Section 747(e) speaks only of a "customary and usual letter of intent to enter into a sales and service agreement," and expressly contemplates that the dealership will be required to "complet[e] . . . operational prerequisites set forth therein . . . ." <u>Id.</u> § 747(e).

Only a handful of courts have interpreted these provisions, but their conclusion has been uniform: Section 747 entitles terminated Chrysler dealers only to a "customary and usual letter of intent." The Court agrees.

In <u>Eagle Auto Mall Corp. v. Chrysler Group, LLC</u>, a district court in the Eastern District of New York reviewed the language and legislative history of Section 747 and found that, because "[t]erminated Chrysler dealers . . . never had any contractual relationship with New Chrysler . . . [they] could not be 'reinstated,' or 'continued' in their dealership agreements. Instead, those dealers were given the right, under the Act, to be 'added' as franchisees." 2011 WL 6754087, at *5 (E.D.N.Y. Dec. 23, 2011). Finding that "the Act's language setting forth the remedy available to prevailing dealers was no doubt chosen because it can be applied to both terminated GM and Chrysler dealers," the former of which maintained a post-bankruptcy contractual relationship with the new GM entity, the court concluded that "the remedy of providing the dealer with 'a customary and usual letter of intent to enter into a franchise agreement,' § 747(e), refers to terms being offered in the post-bankruptcy incarnations of both Chrysler and GM, companies operating in the present, rather than prior to 2009." <u>Id.</u> Although it found that the dealership was therefore "foreclosed . . . from arguing that the statutorily required letter of intent must express the terms of their pre-bankruptcy status," the court nevertheless concluded that triable issues of fact existed as to whether the letters of intent were "customary and usual letters of intent offered to all potential franchisees <u>at the time of the offering.</u>" <u>Id.</u> at *6 (emphasis added).

A New Mexico district court conducted a similar analysis in <u>Quality Jeep Chrysler, Inc. v. Chrysler Group LLC</u>, reaching the same conclusion. No. 1:10-cv-00900-PJK-WDS, Docket No. 138 (D.N.M. Aug. 18, 2011) (2d. Cosgrove Decl., Ex. D [August 18, 2011 Order].) Looking to the same "continuation, reinstatement, or addition" language in Section 747(b), the court found that the statute "apparently provides a remedy to three categories of dealers: those whose dealership agreements were still in effect subject to a wind-down agreement, those whose dealership

agreements had been assumed but were no longer in effect, and those whose dealership agreements were rejected in bankruptcy." Id. at 13. The court found that, "[c]onsistent with Section 747(d) and (e), the issuance of a customary and usual [letter of intent] serves to effectuate the substantive remedy afforded as a result of arbitration . . . ." Id. at 21. In a previous order, the same court rejected the dealership's argument "that it should be in the same position as the 2,200 assumed dealers and that its prior [agreement] terms should prevail," finding that such a view was "untenable" because it "ignore[d] the bankruptcy court's rejection of its franchise, the sale of assets free and clear to [New Chrysler], and the language of Section 747." Quality Jeep Chrysler, Inc. v. Chrysler Group LLC, No. 1:10-cv-00900-PJK-WDS, Docket No. 100 (D.N.M. Mar. 22, 2011) (2d. Cosgrove Decl., Ex. F [March 22, 2011 Order] at 6.)[2] See also Tysinger Motor Co. v. Chrysler Group, LLC, 2011 WL 63866, at *3 (E.D. Va. Jan. 7, 2011) (finding that "Section 747 was very limited in scope," and that relief under that statute "was limited to a letter of intent to enter into a sales and service agreement, subject to certain other conditions and the rights of other dealers under various state dealer laws."

---

[2]This Court reached a conclusion superficially at odds with these opinions in its October 27, 2010 order granting a motion to dismiss by New Chrysler:

> New Chrysler argues that because Star shut down its Chrysler and Jeep dealership in June 2009, it is no longer a dealer within the meaning of Section 285. (Mem. at 7.) However, New Chrysler's argument is without merit. First, Section 747 was enacted on the premise that a number of dealers were improperly terminated in the first place. (Compl., Ex. A.) Any terminated dealer was permitted to seek reinstatement through a Section 747 arbitration. (Id.) Although the process contemplates the re-execution of a dealership agreement in the event that the covered dealer prevails, a covered dealer's success in arbitration amounts to a determination that it should not have been terminated in the first place. (Id.) The Court therefore concludes that the arbitrator's determination essentially conferred dealership status on Star and that to conclude otherwise would be to extend the denial of state law protections that the arbitration procedure was intended to redress. The Court therefore concludes that Star is a "dealer" for purposes of Section 11713.3.

(Docket No. 21, October 27, 2011 Order at 4–5.) This Court also found that, because "Star has adequately pled that other than the Chrysler and Jeep dealership, it also owned Star Ford," and because Star "is still engaged in the business of selling vehicles, it is still a 'dealer' within the meaning of the California Vehicle Code." (Id. at 5 n. 1.) However, as Chrysler notes, this conclusion was reached with respect only to the state law issues, and preceded the evolution of a record in this case and Section 747 case law more generally.

11

1    The legislative history of Section 747 supports that reading.  The House of

2    Representatives actually passed a bill that would have required New Chrysler to "enter

3    into a new dealer agreement with the dealer whose agreement was not so assumed or

4    assigned, and on the same terms as existed immediately before such date," (2d.

5    Cosgrove Decl., Ex. B [LaTourette Amendment]), but the legislation was found to raise

6    serious constitutional questions, (Id., Ex. C [Congressional Research Service

7    Memorandum]), and was not enacted in any event.  It is true, as Star notes, that

8    Representative Van Hollen inserted remarks into the congressional record in which he

9    states that "Congress has included specific timelines for this process and we expect both

10   parties to the arbitration to act in good faith and expeditiously so that added dealers can

11   return to full-fledged operations quickly."  (Sieving Decl., Ex. 8 [Congressional Record

12   of December 10, 2009].)  However, the "expectations" of a single legislator, inserted

13   into the record after passage of the bill, cannot overcome the clear language of the

14   statute, and the clear implication drawn from the differences between the two bills

15   actually passed by Congress.  See INS v. Gardoza-Fonseca, 480 U.S. 421, 442–443

16   (1987) ("Few principles of statutory construction are more compelling than the

17   proposition that Congress does not intend sub silentio to enact statutory language that it

18   has earlier discarded in favor of other language.") (quoting Nachman Corp. v. Pension

19   Benefit Guaranty Corporation, 446 U.S. 359, 392–393, (1980) (Stewart, J., dissenting)).

20   The Court thus concurs with the conclusion reached by these courts, and finds

21   that Section 747's tripartite remedial language corresponds to the varying circumstances

22   in which dealers found themselves after Old Chrysler's and General Motors' respective

23   bankruptcies.  Because Star's previous dealership agreement with Old Chrysler was

24   extinguished and Old Chrysler ceased to exist, Star could not be "reinstated" or

25   "continued" as a dealer.  Rather, the Court finds that Section 747 affords rejected

26   Chrysler dealers the opportunity to be "added as a franchisee to the dealer network."

27   Moreover, regardless of the construction given to the "continuation, or

28   reinstatement . . . or to be added as" language, the statute is clear as to the remedy it

12

affords dealerships that are successful in arbitration. Section 747(e) states clearly that "[i]f the arbitrator finds in favor of a covered dealership" – irrespective of whether the arbitrator orders "reinstatement," "continuance," or "addition" to the dealer network – "the covered manufacturer shall . . . provide the dealer a customary and usual letter of intent to enter into a sales and service agreement . . . ." Accordingly, that letter is the remedy provided for by the statute, and the Court confines its inquiry to the issue of whether New Chrysler complied with its obligations to provide Star with such a letter.[3]

## C. WHETHER THE LETTER WAS "CUSTOMARY AND USUAL"

Star essentially seeks a letter offering it the "same terms and conditions that existed prior to Old Chrysler's bankruptcy". (FAC ¶ 35.) Chrysler contends that the Letter offered to Star was "customary and usual" when considered against other letters offered by Old and New Chrysler. Before addressing that factual question, however, the Court must first construe the statute's "customary and usual" language.

### 1. STATUTORY CONSTRUCTION OF "CUSTOMARY AND USUAL"

As noted above, the Eagle Auto court required the dealership to show that their letters of intent were not "customary and usual" at the time they were offered. 2011 WL 6754087, at * 5. The court acknowledged that the "customary and usual" language "may be interpreted to require pre-bankruptcy terms that might apply to terminated GM dealers . . . ." Id. However, the court reasoned that because "[t]he Act's language setting forth the remedy available to prevailing dealers was no doubt chosen because it can be applied to both terminated GM and Chrysler dealers," therefore "the remedy of providing the dealer with 'a customary and usual letter of intent to enter into a franchise agreement,' § 747(e), refers to terms being offered in the post-bankruptcy incarnations of both Chrysler and GM, companies operating in the present, rather than prior to

---

[3] As noted, the Arbitrator concluded that Star "shall be added to New Chrysler's dealer network with respect to the Chrysler/Jeep dealership it was operating in Glendale, California at the time of rejection in June 2009." (C-SUF ¶¶ 5–6.) Because the scope of the Arbitrator's mandate is naturally bounded by the authority provided for by the Act, the arbitrator had no authority to order that Star be added to the dealer network and this language therefore has no bearing on the Court's analysis.

13

2009." Id.

The Court agrees, and holds that "a customary and usual letter of intent" under Section 747(e) refers to letters issued by the post-bankruptcy incarnation of Chrysler. That interpretation accords with Section 747's remedial scheme. Inclusion of the "customary and usual" language in Section 747(e) ensures that, if a dealer is successful in arbitration, the manufacturer cannot frustrate the purpose of the statute merely by offering the dealer unusual and onerous terms. By requiring covered manufacturers to offer terminated dealers the same terms that they offer to new dealers, the statute guards against that possibility. Merely requiring manufacturers to offer all terminated dealers the same terms would allow them to systematically frustrate Section 747's basic remedial purpose. Requiring manufacturers to look to all historical and industry-wide practice in formulating these letters, by contrast, would be far too onerous a standard and would leave the inquiry open-ended and indeterminate. By looking to the letters of intent New Chrysler has offered to other dealer candidates, the Court ensures that the manufacturer issues a letter of intent complying with the underlying purpose of Section 747, without dictating the precise terms that must be offered to the terminated dealers.

Accordingly, in considering whether or not the Letter issued to Star was "customary and usual," the Court compares that letter to other letters of intent offered by New Chrysler.

**2. APPLICATION TO NEW CHRYSLER'S LETTER OF INTENT TO STAR**

Although the parties offer conflicting evidence as to whether the Letter was "customary and usual" within the meaning of Section 747, only Chrysler addresses the body of evidence which the Court has found is relevant to the inquiry.

Chrysler offers the declaration of John Tangeman, the company's Head of International Network Development and Market Representation, who avers that the Letter issued to Star was generated from a computer template, and that the provisions Star claims are not customary and usual "are found in the vast majority of the [letters issued by Chrysler]." (2d. Cosgrove Decl., Ex. P [Declaration of John D. Tangeman]

("Tangeman Decl.") ¶¶ 5, 10.)  Tangeman states that "Chrysler Group compared and analyzed each provision of the letters of intent issued to new dealers since its inception, as well as those issued by Old Chrysler since 2006 . . . against those provisions that Star claims are not customary and usual."  (Id. ¶ 10.)  That analysis revealed that the contested provisions are contained in anywhere from 75% to 100% of New Chrysler's letters.  (Id. ¶¶ 12–13.)  In particular, paragraphs "substantially identical" to Paragraph 6, addressing a time frame to submit plans for the facility, architectural plans, and facility capacity, were contained in 90% to 96% of all letters.  (Id. ¶ 12.)  Paragraphs "substantially identical" to Paragraphs 8, 11, 13, and 19 were found in 89%, 100%, 75% and 100% of the letters, respectively.  (Id. ¶ 13.)  Finally, Tangeman states that, because Paragraph 5 of the Letter was amended in August 2010, that language "is not part of Star's letter of intent," and therefore was not analyzed.  (Id. ¶ 11.)

By contrast, Star offers the expert opinion of John Altstadt, who has "provided specialized services to the retail automotive industry for over thirty years," in which capacity he has "read [and] considered hundreds of letters of intent and sales and service Agreements for nearly every manufacturer, including Chrysler."  (Sieving Decl., Ex. 10 [Altstadt Expert Report] at 3.)  According to Altstadt, he has "never read a letter of intent or sales and service agreement as one-sided and onerous as the one issued by Chrysler to Star."  (Id.)  In particular, Altstadt opines that the original Letter's vesting of complete discretion in Chrysler "could very likely result in adverse effects for [Star] as to negotiating the purchase or lease of . . . property."  (Id.)  Altstadt further opines that he "simply [does not] understand how any prudent business person would ever agree to [including Paragraph 13] in their franchise agreement," as it would require them to commit substantial assets to the business without sufficient certainty that they would earn a return on their investment.  (Id. at 4.)  A standard letter, Altstadt opines, not only does not give the manufacturer the ability to "pull the franchise with no recourse, [but] also typically adds rewards or 'sweeteners' to entice [and] help the dealer to make these large investments."  (Id.)  Altstadt also avers that he "reviewed a sample letter of intent

15

1    that <u>General Motors</u> issued to a reinstated dealer," and that it included "none of the

2    onerous provisions included in the Chrysler [Letter]." (<u>Id.</u>) (emphasis added). In his

3    deposition, however, Alstadt suggests that modification of Paragraph 5 to state that "the

4    [Letter] wouldn't be withdrawn unless th[e] protest was successful" would bring the

5    Letter "in[to] accordance with what the current law is." (2d. Cosgrove Decl., Ex. M

6    [Deposition of John E. Alstadt] at 35:17–25.)

7         Although Alstadt offers his opinions, his testimony does not address the evidence

8    presented by New Chrysler. New Chrysler contends in its motion that all relevant

9    letters of intent were produced in discovery, including the spreadsheet used by

10    Tangeman to calculate the percentages cited in his declaration. Star has not contested

11    the accuracy of the data which provides the basis for Tangeman's testimony, and Star

12    has not explained why it has failed to address the content of these letters in its motion or

13    in its opposition to New Chrysler's motion. Instead, Star offers expert opinion referring

14    to letters apparently issued by other manufacturers. The failure to even address the very

15    body of evidence which is critical to a determination of whether or not the Letter is

16    "customary and usual" fails to create a disputed issue of fact regarding New Chrysler's

17    analysis of the terms contained in their standard letters of intent.

18         Moreover, the Court finds Star's various arguments in opposition unavailing.

19    Star contends that Congress intended Section 747 to "occupy the field" of dealers whose

20    agreements were rejected during the course of Old Chrysler's bankruptcy. (Docket No.

21    76, Opp. ("Star-Opp.") at 17.) Star argues that "it was not the intention of Congress that

22    Chrysler could avoid the addition of a prevailing dealer by intentionally <u>adding</u> a new

23    dealer, who may then protest Star's re-establishment", which it alleges Chrysler did by

24    adding Jack Ellis Dodge as a dealer on the same day Section 747 was passed. (<u>Id.</u>) Star

25    contends that New Chrysler's amendment to Paragraph 5 of the Letter "does not correct

26    the underlying flaw, as the new language is still such that it leaves a door open for

27    Chrysler to cancel the [Letter] and thereby circumvent the arbitration decision and

28    Section 747." (<u>Id.</u>) Star thus contends that "Chrysler, who created the problem of a

1  potential challenge by adding the Chrysler Jeep lines to Jack Ellis Dodge in the first

2  place, cannot be allowed to rely on state law to avoid re-opening Star."  (Id.)

3      In essence, then, Star contends that a formal comparison of its Letter with

4  Chrysler's other letters is insufficient, and that instead the Court must consider, in

5  determining whether the Letter is "customary and usual," whether that Letter and its

6  substantive effect is "fair and reasonable."  (Id. at 14.)  However, Star does not offer,

7  nor does the Court find any authority for the proposition that Congress can, or that here

8  Congress intended to preempt state law concerning existing dealers' protest rights

9  merely by affording terminated dealers a right to receive a letter of intent to enter into a

10  sales and service agreement.  Nor does the Court find any indication that, in passing a

11  statute that explicitly used the language "customary and usual," Congress in fact meant

12  "fair and reasonable."  As the Court noted above, the statutory language serves to

13  ensure that a manufacturer cannot frustrate the purpose of the statute merely by offering

14  the dealer unusual and onerous terms.  The Court will not, however, read Section 747 as

15  a license to arbitrators and thereafter courts to micro-manage the business relations

16  between New Chrysler and its terminated dealers.  The Court's inquiry must be a

17  narrow one, focusing on whether or not the required letters of intent contain the terms

18  that a "customary and usual" letter contains.[4]  In that respect, Star received what the

19  statute gave it a right to receive, and the parties' subsequent inability to reach a suitable

20  agreement does not retroactively render the Letter deficient.

21      Accordingly, on the basis of the record before it, the Court cannot conclude that

22  there is a triable issue of fact as to whether the Letter was "customary and usual" within

23  the meaning of Section 747(e).  As the Court has construed that provision's "customary

24  and usual" language, the evidence presented by New Chrysler is sufficient to adjudicate

25

26  [4]The same reasoning applies to Star's contention that "[b]y virtue of violating the California Vehicle Code,

27  these provisions cannot be deemed customary and usual."  (S-Mem. at 16.)  Even if this were true, under
the narrow remedy provided for by Section 747, the Court concludes that the relevant inquiry was whether

28  the Letter issued to Star was "customary and usual" when compared to other letters issued by New
Chrysler, and not with respect to the parties' competing characterizations of California's Vehicle Code.

this issue as a matter of law. New Chrysler has provided Star with and conducted a detailed analysis of all letters of intent issued by the company, as well as letters issued by its predecessor dating back to 2006. An examination of these letters demonstrate that the Letter offered to Star by New Chrysler contained provisions that were in the vast majority of letters issued by New Chrysler.[5] Because under the standard articulated by the Court no reasonable jury could conclude that the Letter offered to Star was not "customary and usual," summary judgment should be granted in favor of New Chrysler.

### 3. CONCLUSION RE: SECTION 747 CLAIMS

For the foregoing reasons, the Court holds that [1] Section 747 should be construed to mean that dealers such as Star, whose contracts were rejected during Old Chrysler's bankruptcy proceedings, may be "added as a franchisee" to New Chrysler's dealer network if they are successful in arbitration; [2] the only remedy provided for by Section 747 in such circumstances is a "customary and usual letter of intent" to enter into a sales and service agreement; and [3] New Chrysler, based on the undisputed facts, complied with that requirement because the Letter it offered to Star, when judged against the relevant universe of letters of intent, was "customary and usual."

Accordingly, Star's first cause of action, for confirmation of the arbitration award, fails as a matter of law. Even if confirmation were available under Section 747, the Court cannot "confirm" an arbitration award granting Star a remedy not provided for by the statute. Star's first cause of action is therefore **DISMISSED**. Similarly, Star's second, third, and sixth causes of action, all of which seek various forms of relief for violations of Section 747, are **DISMISSED**.

### D. STATE LAW CLAIMS

---

[5] The Tangeman Declaration does not directly address the frequency with which provisions analogous to amended Paragraph 5 appear in New Chrysler's letters of intent. However, as Defendant notes, amended Paragraph 5 does not allow it to terminate the Letter if a third party mounts a legal challenge to Star's establishment. Rather, Paragraph 5 provides that if a legal challenge brought under state law is <u>successful</u>, the Letter terminates. Thus, as Defendant notes, "the [Letter] is cancelable only if a final judicial order <u>legally prevents</u> Star from establishing [a dealership facility]." (Docket No. 81, Reply ("S-Reply") at 20.)

18

1    Resolution of Star's state law claims largely follow from the Court's previous
2    discussion and the conclusion reached with respect to its Section 747 claims.

3    Summary judgment should be granted on Star's fourth cause of action, for
4    "tortious interference with business expectancy," because Chrysler has a "direct
5    interest" in that relationship.  Marin Tug & Barge, Inc. v. Westport Petroleum, Inc., 271
6    F.3d 825, 832 (9th Cir. 2001) ("California law has long recognized that the core of
7    intentional interference business torts is interference with an economic relationship by a
8    third-party stranger to that relationship, so that an entity with a direct interest or
9    involvement in that relationship is not usually liable for harm caused by pursuit of its
10   interests.") (citing Della Penna v. Toyota Motor Sales, U.S.A., Inc., 902 P.2d 740, 750
11   (Cal. 1995)).  Star provides no authority for the proposition that the relationship
12   between a downstream dealer and its customers can be "interfered" with by that dealer's
13   upstream supplier.

14   Similarly, Star's fifth cause of action, for breach of implied contract and breach
15   of the covenant of good faith and fair dealing, fails as a matter of law because there is
16   no evidence of any implied, let alone express contract.  See, e.g., Gomez v. Lincare,
17   Inc., 93 Cal.Rptr.3d 388, 403 (Ct. App. 2009) ("A cause of action for breach of implied
18   contract has the same elements as does a cause of action for breach of contract, except
19   that the promise is not expressed in words but is implied from the promisor's conduct.")
20   (citation omitted); Rennick v. O.P.T.I.O.N. Care, Inc., 77 F.3d 309, 317 (9th Cir. 1996)
21   ("'[T]he validity of [the covenant of good faith and fair dealing cause of action] is
22   dependent upon the formation of a contractual relationship.' There was no contract, so
23   the claim of breach of the covenant of good faith and fair dealing was properly
24   dismissed.") (citations omitted).  As the Court has noted on several prior occasions,
25   Star's contract with Old Chrysler was extinguished in the process of the company's
26   Chapter 11 reorganization, and the mere issuance of a letter of intent under Section 747
27   did not give rise to a new contractual relationship such that Star can maintain
28   contractual claims.

19

Star's claim for "statutory violations" of California Vehicle Code section 11713.3 also fails as a matter of law. Star essentially seeks to plead around this Court's October 27, 2010 Order granting Chrysler's motion to dismiss a previous version of the same claim. In that Order, the Court explained that:

> [T]he complaint alleges that New Chrysler, in its letter of intent, has sought a waiver of Star's rights under Vehicle Code section 3062. Section 3062 regulates the establishment and location of automobile dealerships and establishes the right of existing dealerships within a ten mile radius of the proposed location to lodge a protest with the New Motor Vehicle Board. DaimlerChrysler Motors Co. v. Lew Williams, Inc., 48 Cal. Rptr. 3d 233, 235 (Ct. App. 2006). Where a protest is filed, the Board must convene an administrative hearing to resolve the dispute. Id.
>
> Star contends that New Chrysler's demand that it waive its section 3062 rights violates Section 11713.3(g); New Chrysler contends that it does not because it had not asked Star to execute a waiver that would relieve any person of liability "imposed by this article." New Chrysler relies heavily on Lew Williams in support of its position. In that case, DaimlerChrysler sued a dealer for breach of contract by lodging a section 3062 protest when it had agreed to waive its right under that section. The dealer sought dismissal under the anti-SLAPP statute on the ground that DaimlerChrysler was barred from recovery as a matter of law. The trial court denied the motion, and the appellate court affirmed. The appellate court expressly rejected the dealer's argument that the waiver violated Section 11713.3. Id. at 239. In its reasoning, the court expressly held that "Vehicle Code section 11713.3 **does not invalidate the waiver because the waiver** did not relieve any person from liability imposed under **article 1 of chapter 4, division 5 of the Vehicle Code**." Id. at 239 (emphasis added).
>
> Here, Star's section 11713.3 claim arises out of New Chrysler's LOI that requires a waiver of Star's rights under Vehicle Code section 3062. (Compl. ¶ 36.) However, as the Lew Williams court held, such a waiver does not constitute a violation of the prohibition contained in section 11713.3(g). Accordingly, because the claim is not legally cognizable, the Court **GRANTS** New Chrysler's motion and **DISMISSES** Star's Third Cause of Action **with prejudice**.

(October 27, 2010 Order at 5–6.)

The relevant version of section 11713.3(g), under which Star's claim was previously dismissed and is now brought, provided that "[i]t is unlawful and a violation of this code for any manufacturer . . . [t]o require a dealer to prospectively assent to a release, assignment, novation, waiver, or estoppel that would relieve any person from liability to be imposed by this Article . . . ." (FAC ¶ 73.) Star now contends that the waiver relates to California Vehicle Code section 11713.3(l), which provides that "[i]t is unlawful and a violation of this code for any manufacturer . . . [t]o modify, replace,

enter into, relocate, terminate or refuse to renew a franchise in violation of Article 4 (commencing with Section 3060) of Chapter 6 of Division 2." Cal. Vehicle Code. § 11713.3(l). As Chrysler contends, "it is [still] Section 3062 that creates Chrysler's substantive obligation to provide notice of an establishment to other dealers in the market and that controls Star's right to protest," and thus "the substantive basis of Star's claim remains subsection (g), the anti-waiver provision, not subsection (l)," which Star cannot establish that Chrysler actually violated. (Docket No. 65, C-Mem. at 21.) Accordingly, Star's attempt to plead around this Court's prior order fails.

Finally, Star's UCL claim relies on violations of Section 747, and therefore also fails as a matter of law. Star alleges that the Letter "contains terms that are unlawful" under Section 747, and that "Chrysler failed to engage in any meaningful negotiation with Star concerning the unconscionable and oppressive terms of its [Letter]." (FAC ¶¶ 93–95.) Accordingly, Star contends, "the [Letter] is clearly intended to oppress Star and advance Chrysler's own agenda, in conscious disregard of Star's rights." (Id. ¶ 95.) In light of the foregoing discussion, and the Court's conclusion that New Chrysler fully complied with its sole obligations to Star, namely those arising out of Section 747, Star cannot maintain a cause of action premised on violations of that statute.

Accordingly, the Court **GRANTS** New Chrysler's motion as to Star's state law claims.

//

//

//

//

//

//

**IV.**

**CONCLUSION**

Based on the foregoing, New Chrysler's motion for summary judgment is **GRANTED** in its entirety. Star's motion for summary judgment is **DENIED**. Defendant is to prepare a judgment consistent with this order no later than the close of business on April 16, 2012.

**IT IS SO ORDERED.**

DATED: **April 9, 2012**

_____
Gary Allen Feess
United States District Judge