UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
EAGLE AUTO MALL CORP., TERRY
CHRYSLER JEEP, INC., JHS BUSINESS
ASSOCIATES INC. D/B/A/ CROSSROADS
SUPERSTORE, and WESTMINSTER
DODGE, INC.,

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

            Plaintiffs,

CV 10-3876

      -against-

(Wexler, J.)

CHRYSLER GROUP, LLC,

           Defendants.
------------------------------------------------------------X
APPEARANCES:

    BELLAVIA GENTILE & ASSOCIATES, LLP
    BY: LEONARD A. BELLAVIA, ESQ.
        STEVEN BLATT, ESQ.
    Attorneys for Plaintiffs
    200 Old Country Road Suite 400
    Mineola, New York 11501

    WILMER CUTLER PICKERING HALE & DORR LLP
    BY: GEORGE MYKULAK, ESQ.
        ROBERT D. CULTICE, ESQ.
    60 State Street
    Boston, MA 02109
    Attorneys for Defendant

    WILMER CUTLER PICKERING HALE & DORR LLP
    BY: NICOLE FEIT, ESQ.
        PETER J. MacDONALD, ESQ.
    399 Park Avenue
    New York, NY 10002

WEXLER, District Judge

    Plaintiffs Eagle Auto Mall Corp. ("Eagle"), and Terry Chrysler Jeep, Inc. ("Terry") are

automobile dealerships that were terminated in connection with the bankruptcy of Chrysler LLC,

1

and certain of its subsidiaries and affiliates ("Old Chrysler").[1] Defendant Chrysler Group, LLC., ("Chrysler") is the entity that purchased certain of the assets in the bankruptcy of Old Chrysler.

In this action, Plaintiffs challenge the implementation by Defendant of their rights under a statute passed after the Old Chrysler bankruptcy. That statute, Section 747 of the Consolidated Appropriations Act of 2010 (the "Section 747" or the "Act"), was passed to grant certain rights to dealerships terminated as a result of the bankruptcy of, inter alia, Old Chrysler. The Act gave dealerships like Plaintiffs the right to participate in binding arbitration to seek "to be added as a franchisee to the dealer network" . . . . §747(2)(b). The court assumes familiarity with its prior opinions in this matter detailing the provisions of the Act and will not repeat those holdings herein. For the purpose of these findings and conclusions it is important only to reiterate that dealers terminated by Chrysler who prevailed under the Act's arbitration provision, were entitled only to be awarded the "customary and usual letter of intent to enter into a sales and service agreement." §747(e).

After completion of extensive discovery and decisions on several motions, this court held a non-jury trial to determine the sole remaining factual issue, i.e., whether Plaintiffs were, as required by the Act, offered "customary and usual" letters of intent to enter into a Chrysler sales and service agreement. A non-jury trial was held on December 3, 2012. The parties have submitted proposed post-trial findings and conclusions. Upon consideration thereof and the proceedings herein, this constitutes the Court's Findings of Fact and Conclusions of Law.

---

[1] This case was commenced by four separate dealerships. Two have since settled, leaving Eagle Auto Mall Corp. and Terry Chrysler Jeep, Inc. as Plaintiffs.

## FINDINGS OF FACT

I.  The Parties

   1. Plaintiff Eagle is a motor vehicle dealer, and a former Chrysler Jeep dealer with a business located in Riverhead, New York.

   2. Plaintiff Terry is a motor vehicle dealer, and a former Chrysler Jeep dealer with a business located in Burnt Hills, New York.

   3. Defendant Chrysler is the entity that purchased certain assets in the bankruptcy proceedings of Old Chrysler.

   4. The Chrylser Jeep franchises of both Eagle and Terry were terminated in connection with the bankruptcy of Old Chrysler.

II. Proceedings Under Section 747

   5. Eagle and Terry sought and participated in arbitration proceedings pursuant to Section 747.

   6. Eagle and Terry prevailed in their arbitration proceedings. As a result, they became entitled to be offered Chrysler's customary and usual letter of intent to enter into a sales and service agreement.

   7. Within seven days of the rulings issued in connection with Plaintiffs' arbitration proceedings, Chrysler issued letters of intent to enter into sales and service agreements to each Plaintiff (the "Letters of Intent").

   8. The Letters of Intent were modified in only one way prior to commencement of this action. Specifically, in August of 2010, Chrysler removed a provision that allowed it to terminate the Letters of Intent if another dealer protested the

establishment of Plaintiffs' dealerships, and that protest was not resolved within thirty days.

III. <u>The Parties' Positions</u>

9. In this lawsuit Plaintiffs argue that the Letters of Intent violate the Act because are not the "customary and usual" letters of intent to which they are entitled.

10. In particular, Plaintiffs' evidence focused on four provisions that, in their view, made their Letters of Intent vary from the required customary and usual terms.

11. The four terms identified by Plaintiffs were: (1) a dealership site approval provision; (2) the time in which to resolve protests raised by opposing dealers; (3) architectural requirements, including a provision that the dealership feature an architectural entrance arch, and (4) a site option, <u>i.e.</u>, an option to purchase the facility.

12. Defendant argues that while not all letters of intent offered are identical in every respect, the Letters of Intent adhered to those terms that were customary and usual in the relevant time period, and were therefore offered in full compliance with the Act.

IV. <u>The Evidence At Trial</u>

13. At trial, the court considered the terms of 135 letters of intent. These letters of intent were jointly admitted into evidence upon agreement of the parties.

14. The letters of intent offered at trial included letters offered to three categories of dealers as follows: (1) those offered to the 50 terminated dealers with which Chrysler reached pre-arbitration settlement; (2) those offered to the 32 terminated dealers (including Plaintiffs) that prevailed in arbitration, and (3) those offered to

4

53 new dealers not previously affiliated with Old Chrysler (the "ordinary course dealers").

15. All letters of intent offered at trial were those offered during the time period of June 2009 through April 2011. This is the time period agreed to as relevant by the parties during the pre-trial discovery process.

16. The terms of the 135 letters of intent were analyzed by the parties and those analyses were presented to the court in the forms of Exhibits 9, 30 and 36.

17. Despite the fact that Plaintiffs' evidence (as set forth in Exhibit 9) focused on the aforementioned four specific terms, the court received and considered evidence as to numerous additional terms, including the square footage of the building and parts and service departments, as well as the number of service stalls and lease requirements.

18. Exhibit 9 analyzes only the four terms of the Letters of Intent as identified above. It is limited in that it compares the terms offered in those Letters of Intent to only 53 of the 135 letters of intent before the court. That is because Exhibit 9 considers only the letters of intent offered to "ordinary course dealers," excluding the letters of intent offered to pre-arbitration settlers, and those offered to dealerships like Plaintiffs that prevailed in their arbitrations.

19. Exhibit 30 analyzes all 135 letters of intent before the court, comparing fifteen separate terms appearing in those letters of intent. The four terms compared in Exhibit 9 are included within the fifteen terms compared in Exhibit 30.

20. Exhibit 36 is Defendants' statistical analysis of the four terms compared in Exhibit 9.

V.  Factual Findings as to Letters of Intent

21. The court's review of the exhibits referred to above reveals the following facts.

22. Thirteen of the fifteen terms identified in Exhibit 30 appear in more than 90% of the 135 letters of intent summarized therein.

23. As to the four terms focused on by Plaintiffs, the court makes the following factual findings.

24. The site approval term appears in 97% (132 of 135) of the letters of intent before the court, and in 70% (37 of 53) of the ordinary course letters of intent. The remaining 30% of the ordinary course letters of intent did not include a site approval term because they involved situations where the site was pre-approved prior to the letter of intent, making the specific inclusion of such a term unnecessary.

25. The dispute resolution term originally included in Plaintiffs' Letters of Intent (which was ultimately removed) appears in 55% of the ordinary course dealer letters of intent.

26. Architectural requirements substantially similar to those appearing in Plaintiffs' Letters of Intent appear in 90% (122 of 135) of the letters of intent before the court, and in 66% (35 of 53) of the ordinary course letters of intent. Of those, 73.5% (39 of 53) include the requirement of an exterior arch.

27. The site option requirement appears in 83% (112 of 135) of the letters of intent before the court, and in 57% (30 of 53) of the ordinary course letters of intent.

## CONCLUSIONS OF LAW

28. As set forth in the earlier legal conclusions of this court, the sole issue at this trial was whether Plaintiffs were, as required by the Act, offered the customary and usual letters of intent to enter into sales and service agreements to become Chrysler dealerships. See Eagle Auto Mall Corp. v. Chrysler Group, LLC, 2011 WL 6754087 (E.D.N.Y. 2011) (declaring that Plaintiffs were not entitled to be reinstated as dealers pursuant to their pre-bankruptcy terms and limiting trial to issue of whether Plaintiffs were offered the customary and usual letter of intent); Eagle Auto Mall Corp. v. Chrysler Group, LLC., 2012 WL 832451 (E.D.N.Y. 2012) (denying motion for reconsideration); Eagle Auto Mall Corp. v. Chrysler Group, LLC, 2012 WL 4579375 (E.D.N.Y. 2012) (denying motion for summary judgment and finding question of fact as to customary and usual nature of letters of intent).

29. The Act does not define the term "customary and usual." Where, as here such a term is undefined, the court gives the term its ordinary meaning. Taniguchi v. Kan Pacific Saipan, Ltd., 132 S. Ct. 1997, 2002 (2012).

30. The parties agree that the term "customary" is defined to include that which is commonly practiced, used or observed. *Merriam-Webster Collegiate Dictionary* 308 (11th ed.); See also http://dictionary.reference.com/browse.customary.

31. The term "usual" is similarly agreed to be defined as that which accords with usage, custom or habit. *Webster's Third International Dictionary*; see also http://dictionary.reference.com./browse.usual.

32. Letters of intent need not be identical in each and every provision to be considered as "customary and usual."

33. The court holds that it is appropriate to compare the Letters of Intent to those offered to all potential dealers given the opportunity to be added to the Chrysler network during the time period referenced above.

34. This requires that the court consider all 135 dealers in the letters of intent before the court and all terms therein.

35. The court therefore holds that it is inappropriate to consider only the letters of intent offered to the 53 ordinary course dealers and only selected terms.

36. Upon such review, based upon the facts set forth above, that court concludes that there is overwhelming evidence that the Letters of Intent offered to Plaintiffs were the customary and usual letters of intent offered to other dealers during the relevant time period, and that the Letters of Intent therefore complied fully with the Act's requirements.

## CONCLUSION

For the foregoing reasons the court dismisses Plaintiffs' sole remaining claim asserting that Defendant has failed to comply with the Act. The court grants Defendant's counterclaim for a declaratory judgment that it has complied with the Act. The Clerk of the Court is directed to enter judgment accordingly and to thereafter close the file in this case.

SO ORDERED.

s/ Leonard D. Wexler

_____
LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
January 24, 2013

8